No. 54,325

DWIGHT HADDOCK, *Appellee*, v. BOARD OF EDUCATION, UNIFIED SCHOOL DISTRICT NO. 462, COWLEY COUNTY, KANSAS, *Appellant.*

(661 P.2d 368)

Opinion filed March 26, 1983.

*Fred W. Rausch, Jr.,* of Topeka, argued the cause and was on the brief for the appellant.

*E. L. Kinch,* of Ratner, Mattox, Ratner, Barnes & Kinch, P.A., of Wichita, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

HERD, J.: This is an appeal from the trial court's decision holding the school board's nonrenewal of Dwight Haddock's teaching contract was not supported by substantial evidence and was in violation of his due process rights. We affirm.

Dwight Haddock was first employed by U.S.D. No. 462 as a teacher of vocational agriculture for the 1975-76 school year. His employment in that capacity continued through the 1978-79 school year, allowing him to acquire tenure under K.S.A. 72-5410 *et seq.*, the Teacher Tenure Law. Mr. Haddock taught a variety of subjects related to vocational agriculture during this period of time, including farm management, farm power (farm equipment), animal science, metal shop and welding shop. He was also employed by supplemental contract as a Future Farmers of America (FFA) sponsor.

During the 1978-79 school year the administration recommended the Board of Education not renew Haddock's contract for the 1979-80 school year. The Board made its administrative

decision to follow the recommendation on March 6, 1979. On April 11, 1979, Haddock was informed by letter of the Board's intention not to renew his contract for the 1979-80 school year. The reasons given for the Board's decision were:

"1. Failure to work with Administration
"2. Failure to maintain adequate control of the classroom
"3. Failure to maintain adequate lesson plans
"4. Failure to properly care for school livestock over the weekend
"5. Failure to properly care for the school equipment."

Later, on August 6, 1979, in response to a request for more specificity, the Board's attorney explained what it meant by "Failure to work with administration":

"(1) Failure to follow orders of the superintendent and principal to have adequate lesson plans for substitute teachers when Mr. Haddock was to be absent because of illness or other reason; (2) failure to follow the directives and orders of his high school principal, Bob J. Wesbrooks, in regard to controlling the behavior of Mr. Haddock's students; (3) permitting students to drive school vehicles after being ordered by his principal and superintendent not to let students drive school vehicles; (4) failure to follow orders and directives of his principal and superintendent in regard to the care of livestock being used in class projects; (5) failure to follow orders and directives of the superintendent and principal in regard to Mr. Haddock's duties in supervising the loading and unloading of students on school buses; (6) failure to follow orders and directives of his principal and superintendent to keep said principal and superintendent advised of his activities on behalf of the school district during the week before and the week after each school year; (7) failure to establish a good working relationship with his principal and superintendent; (8) failure to cooperate with his principal and superintendent concerning his teaching and nonteaching duties for the school district; (9) failure of Mr. Haddock to cooperate with his superintendent in regard to Mr. Haddock's bankruptcy and in regard to garnishment proceedings against Mr. Haddock wherein Mr. Haddock's salary was garnisheed by his creditors."

Pursuant to K.S.A. 72-5438 Haddock requested a due process hearing and a hearing committee was impaneled. The hearing was held on September 10, 11 and 12 of 1979. Afterward, the committee voted two to one recommending Haddock's contract be renewed for the coming year. The full Board considered the hearing committee's recommendation and voted five to two to reject it. A resolution to that effect was adopted February 11, 1980.

Haddock then perfected an appeal to the district court. Judge Robert Bishop, after considering the transcript of the hearing and deposition of the Board members, filed a thirty-nine page opin-

ion reversing the Board. He held the Board's decision was not supported by substantial evidence and the Board had denied the teacher's right to due process. From this ruling the Board appealed.

Appellant first argues the trial court erred in employing the "substantial evidence" standard to gauge the Board's actions. The Board contends the proper standard is one of "minimal evidence," claiming this standard was adopted by the federal district court in *Bogart v. Unified Sch. Dist. No. 298 of Lincoln Cty.*, 432 F.Supp. 895 (D. Kan. 1977).

We reject the Board's argument. The statement in *Bogart* pertaining to the evidentiary standard for due process is inapplicable in this case. *Bogart* arose prior to the Kansas Teacher Due Process Act and enunciates only the minimum standard for constitutional due process. K.S.A. 72-5439 provides:

"The hearing provided for in K.S.A. 72-5438 shall afford procedural due process, including the following:

. . . .

"(f) the right of the teacher to a fair and impartial decision based on substantial evidence."

In addition, this court's position has always been clear. A Board's decision to nonrenew a tenured teacher's contract must be supported by substantial evidence. See *Kelly v. Kansas City, Kansas Community College*, 231 Kan. 751, 755, 648 P.2d 225 (1982) (*Kelly*); *U.S.D. No. 461 v. Dice*, 228 Kan. 40, 50, 612 P.2d 1203 (1980); *Gillett v. U.S.D. No. 276*, 227 Kan. 71, 79, 605 P.2d 105 (1980). The trial court properly employed the "substantial evidence" test.

Let us now turn to an examination of the record for the purpose of determining whether the Board's decision was supported by substantial evidence. We have held in reviewing a district court's decision the Supreme Court will make the same review of the Board's action as did the district court. *Kelly*, 231 Kan. at 754; *U.S.D. No. 461 v. Dice*, 228 Kan. at 49. Under the Teacher Tenure Law, K.S.A. 72-5410 *et seq.*, a tenured teacher may be terminated or nonrenewed only if good cause is shown, "including any ground which is put forward by the school board in good faith and which is not arbitrary, irrational, unreasonable, or irrelevant to the school board's task of building up and maintaining an efficient school system." *Gillett v. U.S.D. No. 276*, 227

Kan. at 78. The burden of showing substantial evidence of good cause rests with the Board. K.S.A. 72-5442; *Kelly,* 231 Kan. at 760. "Substantial evidence" means evidence "which possesses relevance and substance and which furnishes a substantial basis of fact from which the issue can reasonably be resolved." *Kelly,* 231 Kan. at 755; *U.S.D. No. 461 v. Dice,* 228 Kan. at 50; *Brinson v. School District,* 223 Kan. 465, 473, 576 P.2d 602 (1978). The question for this court, then, is whether the U.S.D. No. 462 Board of Education met its burden. The answer requires a detailed examination of the evidence.

The evidence offered by the Board to show good cause for nonrenewal of Mr. Haddock's contract was the testimony of Bob Wesbrooks, the principal; Dean McGrath, the superintendent; Edwin Flower, the custodian; and Myrl Dobbs, a woodworking and drafting teacher whose shop was next door to Haddock's. Documents consisting of evaluations, letters and memoranda were introduced for the purpose of illustrating certain physical circumstances in the shop building where Haddock taught.

In discussing this issue let us use the reasons for nonrenewal outlined by the Board's attorney in his letter specifying what "[f]ailure to work with the administration" meant. The reasons given in the letter were essentially the same as those outlined in the Board's April 11, 1979, letter to Haddock, but with several additional points.

"(1) Failure to follow orders of the superintendent and principal to have adequate lesson plans for substitute teachers when Mr. Haddock was to be absent because of illness or other reasons."

Mr. Wesbrooks testified Haddock's performance in this regard had deteriorated from above average in 1977 to needing improvement in 1979. The Board also offered evidence of three letters written by Mr. McGrath expressing his concern over the absence of lesson plans. The first letter, dated February 1, 1978, was written to Mr. Wesbrooks after McGrath had substituted in the Vocational building. It stated that in the metals area, where Haddock taught, "No lesson plans are available so I suppose the students basically lack directions!" The second letter, dated September 18, 1978, was from McGrath to Haddock. It stated:

"You need to have weekly lesson plans on file in your desk in case of absence such as last Thursday, September 14.
"This calling in absence [*sic*] and giving me the daily plan on the phone doesn't do the job.

"Lesson plan books and grade books are issued at the beginning of each school year. The purpose of both is to help the substitute maintain adequate records and follow a set classroom procedure."

Finally, a January 4, 1979, letter to Haddock expressed McGrath's concern over Haddock's "lack of lesson plans, you always have to call in the plan rather than having it in the school issued plan book."

Haddock responded by testifying that prior to 1979 he gave oral instructions and instructions written on his tablet to substitute teachers without objection from the administration. Other teachers testified the lesson plan books issued by the school were rarely used to advise substitutes of what should be done. Mr. Wesbrooks admitted on cross-examination lesson plans were not essential for shop-oriented courses because the students pursued their ongoing projects without interruption regardless of who supervised. Such projects made up a large portion of Haddock's teaching load. Wesbrooks also acknowledged he was not strict regarding lesson plans with those teaching project-oriented courses.

"(2) [F]ailure to follow the directives and orders of his high school principal, Bob J. Wesbrooks, in regard to controlling the behavior of Mr. Haddock's students."

The Board offered evidence that Haddock's failure to control his students resulted in vandalism and poor housekeeping in the shop area. First, in McGrath's January 4, 1979, letter to Haddock the superintendent stated:

"The upkeep of the shop area, classroom, restroom, tool room, and office area is below standard. Your students have taken cans of spray paint, brown and black, and written names, some vulgar, in the restroom area and on the outside of the vocational building."

The Board presented photographs of the shop area to illustrate these problems. Another letter from McGrath blamed Haddock for hand cleaner which had been smeared over lockers in the shop area. McGrath stated it "appeared" this was the work of Haddock's fifth and sixth hour students. Mr. Flower, the custodian testified a few tools were sometimes left outside the shop area after school where the students were forced by overcrowded conditions to work on their projects.

The Board also offered the testimony of Myrl Dobbs, another shop teacher, to show Haddock had lost control of his students.

He testified Haddock's students came to his shop to "visit his girls" and that several brooms he loaned to Haddock's students had disappeared. In Dobbs' opinion Haddock's students had no respect for their teacher. His opinion was based in part on an incident in which a student called Haddock a son-of-a-bitch. Haddock took the student to the principal and refused to take him back in class. Dobbs admitted a student had once referred to him in that manner. Dobbs, also a football coach, stated he tore all the buttons off the student's shirt.

Finally, the Board offered evidence of administrative evaluations of Haddock's ability to control students. Again, from March 1978 to March 1979, the rating in this area had gone from above average to "needs improvement."

On the other hand, Wesbrooks admitted he had only "indirect" knowledge the shop damage was done by Haddock's students. There was never any direct testimony the shop damage was done by Haddock's students. For example, it turned out no one knew whether the hand cleaner vandals were students of Dobbs or Haddock. Further, there was no testimony Haddock condoned the damage or fostered an attitude of disrespect for school property. The school administration had a liberal policy toward the use of school facilities, including the shop, by the public and student groups. The Board's evidence failed to establish Haddock's students were responsible for the damage.

It is clear Dobbs' problems with Haddock were of a philosophical nature. Dobbs was a strict disciplinarian, while Haddock, although not afraid to discipline students, was inclined to accept the fact some students are "ornery."

The photographs offered by the Board depict some disrepair and damage to the shop area. Again, however, there was no direct evidence this was caused by Haddock's students. Indeed, the worst damage shown, that of a steel pipe penetrating one of the shop doors, was illustrated by simulation in a photograph taken by McGrath and Wesbrooks after the incident occurred and after the decision to nonrenew had been made. The testimony regarding this incident indicated the door had only been cracked before the picture was taken.

Finally, with regard to the poor evaluation of Haddock's ability to control his students, it should be noted this evaluation was done after a tentative decision to nonrenew Haddock had been

made. It is evidence McGrath made an effort to document the decision to nonrenew after the fact.

"(3) [P]ermitting students to drive the school vehicles after being ordered by his principal and superintendent not to let students drive school vehicles."

This concern emanated from a fatal accident which occurred in 1975 while a student was operating a school-owned pickup. It was conceded Haddock bore no responsibility for the accident.

Wesbrooks testified he once saw a student of Haddock's driving a school pickup to haul feed and straw. Haddock testified he had twice permitted the use of a school tractor by students to clear a path through the snow so water could be hauled to school livestock but never permitted students to drive the pickup. After receipt of a memo from Wesbrooks the students were not allowed to use the tractor again. David Brothers, who taught with Haddock during the 1978-79 school year, testified he saw students of other teachers driving the tractor on numerous occasions after Wesbrooks' memo to Haddock.

"(4) [F]ailure to follow orders and directives of his principal and superintendent in regard to the care of livestock being used in class projects."

The care of the animals was a student responsibility as part of a course in animal science. McGrath testified regarding one incident when some sheep were without food and two or three times when the hogs were without water. There was also an incident where a hog was electrocuted as a result of chewing on a brightly colored wire which supplied electricity to a water heater.

Haddock admitted there were times when the sheep and hogs were not fed or watered on time. He testified this was a student responsibility and that since they used self-feeders and waterers with a reserve supply the animals were in no danger of harm from lack of feed or water. There was no evidence Haddock was at fault by not caring for the animals or providing for their care by students. All members of the hearing committee agreed this charge had not been substantiated.

"(5) [F]ailure to follow orders and directives of the superintendent and principal in regard to Mr. Haddock's duties in supervising the loading and unloading of students on school buses."

Bus duty was assigned to every teacher in the school. Wesbrooks testified there had been times when Haddock failed to

show up for this duty. The Board offered a letter dated September 27, 1976, from Wesbrooks to Haddock which stated:

"I informed you last week of your late arrival at school. Bus duty is a part of the job. I realize FFA has you very busy, but the school structure should come first in your line of duty."

Wesbrooks also testified bus duty was "easily forgotten," and he didn't consider it of sufficient importance to include in Haddock's evaluations. Other teachers testified they had forgotten about bus duty periodically but had never received a written reprimand.

"(6) [F]ailure to follow orders and directives of his principal and superintendent to keep said principal and superintendent advised of his activities on behalf of the school district during the week before and the week after each school year."

This criticism is apparently related to the fact the Board agreed to put Haddock on a ten-month instead of a nine-month contract. McGrath had requested Haddock give him and Wesbrooks a schedule indicating the teacher's activities during the two weeks prior and the two weeks subsequent to the 1978-79 school year. Haddock failed to provide the two-week schedule at the end of the 1978-79 school year. Since this criticism refers to an incident which occurred after the Board decided to let Haddock go, it is irrelevant. In spite of that it is interesting to note Haddock testified he saw McGrath every day the first week and the second week he was at an FFA convention which the administration authorized.

"(7) [F]ailure to establish a good working relationship with his principal and superintendent;
"(8) [F]ailure to cooperate with his principal and superintendent concerning his teaching and nonteaching duties for the school district."

These two reasons are essentially indistinguishable. Wesbrooks and McGrath characterized them as generalizations of the preceding reasons.

There was considerable evidence concerning Haddock's relationship with the two administrators and his willingness to cooperate with them. First, there were Wesbrooks' evaluations of Haddock. On October 30, 1975, Wesbrooks characterized Haddock as an enthusiastic teacher who "works well with [the] rest of faculty." On February 3, 1976, Wesbrooks wrote Haddock "has been receptive to change." In October of 1977 the principal stated Haddock was "Receptive to change but need a more

structured classroom with more organization." On February 11, 1977, the evaluation form read: "Your planning and classroom organization has certainly shown improvement. I appreciate your co-operation and like the way you work with the staff." Again, in March of 1978, Wesbrooks wrote: "You are receptive to change and accept criticism readily." Suddenly, however, in the evaluation written March 6, 1979, Wesbrooks appeared to have an eye on the coming litigation:

"You have so many things going that some don't get done well. There has been considerable destruction to the classroom and tool room as well as to the running track. Housekeeping needs improving. Permitting students to drive school vehicles, if an accident should occur, could be serious. The type of students you have need constant supervision at all times. You will need to organize to do this. You are a good FFA sponsor."

McGrath and Wesbrooks attempted to explain the inconsistency between the high evaluations they had given Haddock for cooperation prior to the controversy and their present allegations of failure to cooperate and work with the administration. They made tortured distinctions between cooperation as a function of personality and cooperation as necessary to the performance of teaching responsibilities. These explanations defy reason. We are led to believe Mr. McGrath gave the true reason for the change of attitude to Haddock in his testimony on cross-examination:

(Question by Mr. Kinch)
"Q: Something intervened, I guess, to cause this dramatic change in your attitude. One of the things that intervened during the years between was that Mr. Haddock was involved in professional negotiations as a chief negotiator for the Association in the year of 1977-78, wasn't he?
"A: That was one of his problems, yes."

McGrath had been chief negotiator for the Board and Haddock for the teachers. After negotiating from December 1977 to July 1978, no agreement was reached and the Board issued unilateral contracts to the teachers.

No evidence was offered concerning reason No. 9 and it was accordingly dismissed at the conclusion of the Board's case.

We must look at the Board's evidence in the context of the surrounding circumstances. Haddock's classes were too large and included the students with discipline problems. His courses were primarily project-oriented. The shop furnished Haddock was also used for a bus garage part of the time which restricted

the useable space for student projects. Under school policy the shop was accessible to the public and other students. There was no way Haddock could be held responsible for tools, equipment or care of the shop area. Further, there was no credible evidence Haddock permitted students to drive the school pickup. There was evidence students drove the tractor twice under Haddock's supervision but the evidence the coaches used student operators of the tractor more often than Haddock cast reflections on the good faith of the criticism of Haddock. Finally, everyone admitted Haddock was an outstanding FFA sponsor. In light of these circumstances, and the administrators' admissions concerning Haddock's cooperation, and that being a negotiator was his problem, we conclude the Board complaints were not supported by substantial evidence.

The Board also argues the trial court erred in holding the Board violated Haddock's right to due process. The court held this right was violated in two respects: (1) by the Board's reliance on evidence outside the record; and (2) by the Board's including in its final resolution to nonrenew reasons which were not included in the notice of nonrenewal or argued before the hearing committee.

That some of the Board members relied on evidence outside the record came to light in depositions taken subsequent to the due process hearing. Three Board members testified they had investigated Haddock beyond the hearing committee proceedings and had given weight to their extraneous determinations. The first question presented by the depositions is whether they violate the rule set out in *Kelly v. Kansas City, Kansas Community College,* 231 Kan. 751, 757, 648 P.2d 225 (1982) where we held:

"[A]bsent statutory authority an administrative body performing a quasi-judicial function is not subject to inquiry concerning its mental processes in reaching a decision."

The district court found the depositions were admitted by stipulation. The record, however, reveals no such agreement. In fact, counsel for the school board filed a motion for protective order to keep the depositions from being taken. Thus, admissibility of the depositions is in issue.

As noted above, we held in *Kelly* the mental processes of the Board in reaching a quasi-judicial decision are not subject to

inquiry or review. We also noted, however, the mental process rule is inapplicable where a prima facie case of misconduct is shown. 231 Kan.at 757; *KFC National Management Corp. v. N.L.R.B.*, 497 F.2d 298, 305 (2nd Cir. 1974). Thus, inquiry into improper *conduct* of board members may be proper. Here the depositions were geared toward the conduct of school board members in pursuing their own investigations. As such the depositions were properly admitted.

Further, it is clear the conduct engaged in by certain members of the Board violated Mr. Haddock's right to due process. Here, three of the five board members who voted to ignore the hearing committee's recommendation testified they conducted their own independent investigations into the facts. They interviewed witnesses and sampled public opinion about the case. For example, Mrs. Ballin, a former board member, presented to board member Kessinger a letter which was essentially a statement of facts condemning Mr. Haddock. Kessinger took the letter to the Board meeting February 11, 1980, when the report of the hearing committee was considered. Copies of the letter were circulated to all board members during the executive session before final action was taken.

It has been said, "due process requires at least notice, a hearing, and a method of decision which does not offend the concept of fundamental fairness." *Bogart v. Unified Sch. Dist. No. 298 of Lincoln Cty.*, 432 F. Supp. at 905; *Kelly,* 231 Kan. at 761. Indeed, the United States Supreme Court has recognized that:

"Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." *Greene v. McElroy,* 360 U.S. 474, 496, 3 L.Ed.2d 1377, 79 S.Ct. 1400 (1959).

See also Schwartz, Administrative Law § 67, pp. 192-93 (1976). Here, Mr. Haddock had no opportunity to hear the evidence gathered during the independent investigations or to cross-examine the secret witnesses to test their credibility. This procedure was fundamentally unfair. We hold the Board violated Mr. Haddock's right to due process.

We recognize a board of education has a dual role as both an

administrator and a quasi-judicial body. Regardless of the inherent difficulty in the conflict of these roles, the teacher's entitlement to a "fair and impartial decision" (K.S.A. 72-5439[f]), requires that the Board strive for a high standard of detached objectivity when performing its role as a quasi-judicial body. Attainment of this standard demands the Board abandon its role as prosecutor after the due process hearing and make a good faith review of its previous tentative decision in light of the case presented to the hearing committee. Accordingly, board members should refrain from discussing the case with any persons other than fellow board members and counsel from the date the hearing is completed until the Board renders its final decision.

The Board also violated Mr. Haddock's right to due process in another way. In connection with its final decision to nonrenew Haddock the Board passed a resolution outlining the reasons for its actions. Those reasons included: "(1) Poor use of classroom space; (2) favoritism towards students in F.F.A.; (3) failure to use grade books as required; (4) lack of resourcefulness, innovation and common sense; (5) blame of the administration for his own shortcomings." Obviously this was a wholesale change from the reasons given at the time of the Board's initial decision to nonrenew. Haddock received no notice of these items and was thus not able to prepare a defense to them at the hearing. As such the essential elements of due process were not met. A teacher whose contract is being nonrenewed is entitled to be judged solely on the reasons enunciated in the notice of nonrenewal. Due process requires no less.

Appellee also complains the Board's attorney acted improperly in advising the Board concerning procedure and the evidence after the due process hearing. Under the present legislative scheme, the actions of the Board's attorney were proper.

Appellee argues the Board violated the Kansas Open Meetings Act, K.S.A. 75-4317 *et seq.*, in adopting a resolution during an executive session of the Board on February 11, 1980. In light of our action on other issues herein that issue is moot.

We conclude Dwight Haddock's teaching contract was improperly nonrenewed. The judgment is affirmed and the case remanded to the district court for determination of the amount of salary and interest owed appellee.