(805 P.2d 40)

No. 63,929 ■

CARL O'HAIR, *Appellee,* v. BOARD OF EDUCATION, UNIFIED SCHOOL DISTRICT NO. 300, COMANCHE COUNTY, KANSAS, *Appellant.*

Opinion filed June 22, 1990.

*Fred W. Rausch, Jr.,* of Topeka, for appellant.

*David L. Patton* and *Debra J. Wilson,* of Patton & Kerbs, of Dodge City, for appellee.

Before BRAZIL, P.J., LARSON, J., and JOHN W. WHITE, District Judge, assigned.

LARSON, J.: The Board of Education of Unified School District No. 300, Comanche County, Kansas, appeals from a district court reversal of the Board's decision to nonrenew the contract of Carl O'Hair, a tenured teacher, following a reduction in force of teaching staff for fiscal reasons.

O'Hair is one of two tenured teachers whose contracts were not renewed in April 1986 for the 1986-87 school year because of a Board-directed policy to reduce the budget following a drastic loss in district valuation resulting from decreased oil prices.

O'Hair had taught in the district since 1969. At the time his contract was nonrenewed, he was a part-time assistant principal and taught three classes—government, American history, and world history—all at Coldwater High School. The year following O'Hair's contract nonrenewal, other administrators assumed his assistant principal duties and three tenured teachers (Carlos Amaro, world history; Charles Fiegel, government; and John McNeely, American history) took over his class load.

Amaro and Fiegel had less seniority in the district but were clearly certified in the subjects in which they replaced O'Hair. McNeely also had less seniority in the district than O'Hair, but there was some confusion concerning his credentials. He had previously taught American history, but his certification had been dropped. Calls were made to his college and the State Department of Education to satisfy the administration that McNeely could teach American history. McNeely did not receive his provisional certificate to teach American history until August 1988, although the school district received no complaint from the state about using a noncertified teacher for 1986-87 or 1987-88.

After he received notice that his teaching contract would not be renewed, O'Hair requested the hearing to which he is entitled under K.S.A. 1989 Supp. 72-5438. The hearing was inexplicably delayed until January 30, 1989, when district administrators presented evidence of the procedure they had followed in recommending O'Hair's contract for nonrenewal. At the hearing, O'Hair presented evidence which included the allegation that he could have been given a full schedule by being allowed to teach high school physical education and American history at the other high school in the district, Protection High School.

At the conclusion of the hearing, the three-member committee ruled:

"Item 1, on a vote of 3-0, the committee found that the Board of Education of U.S.D. 300 did follow the RIF [reduction in force] policy GBQA-R. In so agreeing, one committee member felt that the policy was not clear on the ruling of a tenured teacher.

"Item 2, on a vote of 3-0, the committee found that the Board of Education of U.S.D. 300 did in fact discharge a more tenured teacher than those teachers who taught the classes of the discharged teacher in the '86-'87 school year.

"Item 3, on a vote of 3-0, the committee found that the reason given on the notice of nonrenewal to Mr. O'Hair was not false.

"In conclusion, on a 2-1 vote, the committee found that the Board of Education of U.S.D. 300 was justified in nonrenewal of Mr. O'Hair. The dissenting vote came from the fact that the teachers with less tenure were hired to replace a teacher with more tenure."

The Board heard the arguments of counsel on the findings of the due process hearing committee on February 15, 1989, but no action was taken at that meeting. Sometime prior to the next meeting, which was held on March 6, 1989, Superintendent James Chadwick had a resolution prepared at the request of the Board, confirming O'Hair's contract nonrenewal.

The Board went into executive session at its March 6, 1989, meeting, discussed the nonrenewal issue with the superintendent and reviewed the exhibits presented to the due process committee. The transcript of the due process hearing had been read by each Board member. After discussion, the Board reached a consensus as to the action it wished to take. The Board returned to an open meeting and voted unanimously to approve O'Hair's contract nonrenewal.

O'Hair appealed to the district court, which reversed the Board's decision and found (1) the preparation of the resolution in advance of the hearing precluded due process and indicated the Board acted in an arbitrary and capricious manner; (2) the Board's failure to examine O'Hair's competence, interest, and training as well as that of the teachers who replaced him was arbitrary, unreasonable, and capricious; (3) no good cause for O'Hair's contract nonrenewal was shown because the three replacements had less tenure than did O'Hair and one was not certified to teach American history; (4) the Board failed to consider O'Hair for other full- or part-time positions for which he was certified; (5) the record discloses no evidence that O'Hair was incompetent and that he lacked skill and training to teach all the subjects on his teaching certificate; (6) the Board failed to produce substantial evidence of any good cause for nonrenewal; and (7) the Board made its decision prior to the March 6 meeting, as

evidenced by a resolution having been previously prepared. The district court noted the decision to nonrenew was made in executive session which seemed to the court to be a violation of K.S.A. 75-4319 and was another indication that nonrenewing O'Hair's contract was arbitrary, unreasonable, and capricious. The Board was ordered to reinstate O'Hair and pay him the salary and fringe benefits he would have received had his contract been renewed, less credit for income O'Hair received during this period of time.

The Board appeals. We reverse.

### Scope of Review

The Board erroneously cites *Southwest Kan. Royalty Owners Ass'n v. Kansas Corporation Comm'n,* 244 Kan. 157, 769 P.2d 1 (1989), as authority for the argument that the Act for Judicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-601 *et seq.,* is applicable in this case. K.S.A. 77-603 declares the Act applies to "agencies." K.S.A. 77-602(a) says " '[a]gency' means a state agency." K.S.A. 77-602(k) defines a state agency as

"any officer, department, bureau, division, board, authority, agency, commission or institution of this state which is authorized by law to administer, enforce or interpret any law of this state *but does not include any political or taxing subdivision of the state, or any agency thereof,* or the judicial or legislative branch of state government." (Emphasis added.)

Professor David L. Ryan in his Comment, *The New Kansas Administrative Procedure Judicial Review Acts,* 54 J.K.B.A. 63 (1985), states:

"The recommendation of the Judicial Council was for a comprehensive statewide judicial review act for all agencies, state and local. It is at least partially attributable to the opposition of local municipalities that judicial review of local agency actions is left to the disparate treatment provided by (1) the peculiarities of local agency enabling acts, (2) K.S.A. 60-2101(d), for quasi judicial action, and (3) for all other local level agency action, the eternal quagmire of the extraordinary remedies as interpreted and applied in Kansas."

The Kansas Supreme Court was asked to apply the K.S.A. 77-618 and -619 standards to appeals of zoning decisions but refused to do so in *Landau v. City Council of Overland Park,* 244 Kan. 257, 273, 767 P.2d 1290 (1989), wherein it stated: "The Act specifically excludes municipal and county actions and, therefore

would exclude review of rezoning decisions. K.S.A. 77-602(a) and (k). (The definition of 'state agency' does not include 'any political or taxing subdivision of the state.')" This is an appeal under K.S.A. 1989 Supp. 60-2101(d) from the decision of a school district sitting as a quasi-judicial body. Unified school districts are not state agencies. The Act for Judicial Review and Civil Enforcement of Agency Actions does not apply.

Our scope of review is fully set forth in *Butler v. U.S.D. No. 440*, 244 Kan. 458, 463-64, 769 P.2d 651 (1989), where Justice Herd summarized the duty of an appellate court in the following manner:

"K.S.A. 1988 Supp. 60-2101(d) gives the district court jurisdiction to review the Board's decision. The district court may not hear the case de novo, but is limited to deciding whether: (1) The Board's decision was within the scope of its authority; (2) its decision was substantially supported by the evidence, and (3) it did not act fraudulently, arbitrarily, or capriciously. In *Gillett v. U.S.D. No. 276*, 227 Kan. 71, 75, 605 P.2d 105 (1980), we held:

" 'In determining cases involving the dismissal or nonrenewal of a teaching contract, the courts are obligated to consider the rights of the teacher, the rights of the school board, and the rights of the school children to receive a quality education in a proper school atmosphere. In every such case, the challenge presented to the court is to provide a decision, fair and equitable both to the teacher and to the school board, with a minimum amount of disruption of the educational opportunity for the children.'

"We held in *Million v. Board of Education*, 181 Kan. 230, Syl. ¶ 1, 310 P.2d 917 (1957), that, while the Teacher Tenure Act protected tenured teachers from 'unjust dismissal of any kind—political, religious or personal,' it 'does not confer special privileges or immunities upon them to retain permanently their positions or salary, nor permit their interference with the control or efficient operation of the public-school system.'

"Where the district court's decision is appealed, we review the Board's decision as though the appeal has been made directly to us, and we are subject to the same limitations of review as the district court. *Kansas State Board of Healing Arts v. Foote*, 200 Kan. 447, 451, 436 P.2d 828 (1968)."

The limited scope of review was first stated in *Foote* as follows:

" 'A district court may not, on appeal, substitute its judgment for that of an administrative tribunal, but is restricted to considering whether, as a matter of law, the tribunal acted fraudulently, arbitrarily or capriciously, whether the administrative order is substantially supported by evidence, and whether the tribunal's action was within the scope of its authority.' " 200 Kan. at 450.

For the purpose of determining whether the district court observed the requirements and restrictions placed upon it, we must make the same review of the administrative tribunal's action as did the district court. *Kelly v. Kansas City, Kansas Community College,* 231 Kan. 751, 754, 648 P.2d 225 (1982).

*Was the Board's decision to nonrenew O'Hair's contract in order to reduce 1986-1987 expenditures valid?*

The parties' consideration of this issue is unnecessary. O'Hair concedes the district had the power to determine the necessity of a reduction in staff when he stated in his brief:

"The trial court did not find that the School Board exceeded its authority when it determined to reduce its budget, nor does the plaintiff assert that the School Board did not have the authority to make that determination. Both the District Court and the plaintiff do assert that the process for selecting Mr. O'Hair for nonrenewal as a means of achieving a reduction in force was flawed."

The Supreme Court in *Gillett v. U.S.D. No. 276,* 227 Kan. 71, 605 P.2d 105 (1980), made no mention of the rights of taxpayers to compel reductions in expenditures through Board action. The balancing required by *Gillett* involves the rights of teachers, school boards, and school children, which is all that is in issue herein. The decision to reduce the school's budget neither warrants or needs any further discussion.

*Was the Board's decision to nonrenew O'Hair's contract properly reached?*

Both parties reduce this issue into two parts: one being whether substantial competent evidence existed and the second being whether Board policies were followed. The only real issue is O'Hair's selection for dismissal.

The Board had a specific policy covering the reduction of teaching staff, which states:

"GBQA *Reduction of Teaching Staff* GBQA

"In the event the board decides that the size of the teaching staff must be reduced, guidelines in the rules will be followed. Insofar as possible, reduction will be accomplished by attrition due to resignations and retirement and by nonrenewal of nontenured teachers.

"GBQA-R *Reduction of Teaching Staff* GBQA-R

"The following steps will be utilized by the district's administrative staff to reduce the teaching staff:

"To determine the number of teaching positions to be reduced, the administrative staff will ascertain the educational program for the district to meet the educational goals established by the board. The number of teachers needed to implement the district's educational program will then be determined by the administrative staff based on those educational goals as determined by the board.

"All teachers will be evaluated in relation to the educational goals of the district. Individual qualifications and specific skill areas or disciplines shall be ascertained and applied to the teacher needs of the district. Evaluation forms, instruments or tools will be used to measure each staff member's teaching ability.

"In the event two or more teachers have similar qualifications and skills in a teaching area deemed necessary to fulfill the district's educational goals, the superintendent may recommend the tenured teacher, if any, for the position in question."

To determine if the decision was substantially supported by the evidence, it is necessary to review the actual selection procedure which was utilized.

O'Hair argues here that the school district failed to evaluate his "competence, skill, interest and training," which was in violation of its own policy. The record shows O'Hair did not argue this point at the due process hearing or raise this issue at the district court. "Ordinarily, an issue cannot be raised for the first time on appeal." *In re Appeal of City of Lenexa*, 232 Kan. 568, 587, 657 P.2d 47 (1983).

When the district court found that "[n]owhere in the transcript or the exhibits does there appear any evaluation of O'Hair's competence, skill, interest and training. In fact, nowhere in the record does there appear any evidence of evaluation of Mr. Amaro, Mr. Fiegel and Mr. McNeely's skill, interest and training," this issue was raised for the first time.

A review of the record from the due process hearing shows that ample evidence was presented that school administrators followed the Board policy in selecting O'Hair's contract for nonrenewal. The record includes a transcript of the due process hearing, plus a binder of the documents presented at the hearing.

Those records show that, after a determination was first made that staff reductions were necessary, the administrators reviewed the credentials and teaching assignments of nontenured faculty to determine if any of them could be dismissed without negatively affecting the district's educational program. Once it was deter-

mined that no nontenured teachers could be dismissed, the administrators evaluated the teaching skills and abilities of the tenured faculty in relation to the district's desires to maintain then-existing programs.

Sam C. Rawdon, the Coldwater High School principal, testified at the due process hearing as follows:

"Q. After you reviewed nontenured staff qualifications and certifications, then describe for me what you did from that point.

"A. We took an alphabetical listing of all the employees, I did, in Coldwater, and went down and said, can I eliminate this person and continue to offer, perhaps if it's a second grade teacher, can we teach the second grade next year without this person. Can someone else cover it. If it was another academic area, in the secondary area, we said, can we eliminate that person's position and maintain the program at the current level. And there was only one person, in my area, that met that situation.

"Q. And who was that person?

"A. That was Mr. O'Hair.

. . . .

"Q. And I assume this reflects your conclusions, then, as to his ability to apply his certificate in these other areas?

"A. That was the next step. We said, is there anything, any position, that Mr. O'Hair could in effect bump, you know, in the Coldwater schools K-12, we took every single one of them, that's every single person in our employ at that time, what their assignment was as listed there, and it's spelled out on each one of them what Mr. O'Hair could not do in their area.

"Q. For example, you have Mr. McNeely as a science and social science teacher. That's his assignment. Is that correct?

"A. That's correct.

"Q. And Mr. O'Hair's not certified in that area?

"A. That's correct.

"Q. And you did that for each teacher?

"A. Uh-huh.

"Q. And following your evaluation of the staff, did you then make a recommendation to the administration and Mr. Chadwick as to what teacher fit the criteria and would fit into the reduction in force policy?

"A. We did.

"Q. And who was that individual?

"A. Mr. O'Hair."

The results of this review and a similar one done with teachers in the Protection schools were discussed and evaluated in a series of administrative meetings and recorded on a chart on a blackboard reserved for this purpose.

The due process hearing committee reviewed this information as well as the documents provided by the Board of Education and voted 3-0 that the Board had followed its procedures, although one member felt the policy was not clear on the ruling involving a tenured teacher.

The record refutes the trial court's finding that "[n]owhere in the transcript or the exhibits does there appear any evaluation of O'Hair's competence, skill, interest and training." The trial court is correct that the levels of competence to teach specific subjects were not compared, but it was not necessary for the administration to do so under the policy in effect.

O'Hair contended at the due process hearing that the Board could have provided him with a full schedule if he had been allowed to teach American history at Protection and high school physical education. The Board counters that to have done this would have required three tenured teachers to have been given part-time contracts for the 1986-87 school year.

Although our factual situation herein differs, it is necessary for us to consider if the decisions of several recent Kansas Supreme Court decisions require that O'Hair be retained.

In *Coats v. U.S.D. No. 353*, 233 Kan. 394, 662 P.2d 1279 (1983), the school board decided to eliminate one full-time high school English teacher because of declining student enrollment. Ms. Coats was selected for nonrenewal because she had the least seniority of the high school English teachers. Ms. Coats was not considered for a junior high English position for which she was certified and for which nontenured junior high school English teachers had been retained.

The Kansas Supreme Court held the school board's action was arbitrary and capricious and ruled that "unless good cause is otherwise shown a tenured teacher may not be nonrenewed due to reduction in force until all nontenured teachers teaching subjects which the tenured teacher is qualified to teach· are first terminated." 233 Kan. at 402.

*Coats* is not applicable to our case because here there were no nontenured teachers retained to teach the subjects O'Hair is qualified to teach.

The Kansas Supreme Court in *Butler v. U.S.D. No. 440*, 244 Kan. 458, 769 P.2d 651 (1989), considered the question of whether

a board of education is required to reduce some teachers to part-time in order to retain a tenured teacher. Butler had the least seniority of three tenured industrial arts teachers. When declining enrollment resulted in the elimination of one of these positions, Butler contends he should have been assigned three physical education classes (being taught by a nontenured football coach) for which he was certified, two periods (assigned to a nontenured basketball coach) for which certification was not required, and a remaining hour of either freshman physical education (for which he was only partially qualified) or other positions for which no certification was required.

Such changes would have required at least two nontenured teachers to be reduced to part-time. Their positions could not be eliminated because the basketball coach taught four hours of social science and the football coach taught three hours of elementary physical education for which Butler was not certified. The issue in *Butler* was whether the school board was required under *Coats* to create a position for a tenured teacher of three class periods which were being taught by nontenured teachers.

Before holding this issue must be decided on a case-by-case basis, Justice Herd in *Butler* cited the Minnesota rule, which requires realignment of schedules where reasonably practical to accommodate tenured teachers; the Pennsylvania rule, which requires realignment only if practicable; the Alabama rule, which holds realignment of schedules is not required; and the Illinois rule, which holds that to permit a teacher to create piecemeal positions by taking and combining courses from other teaching positions, even if held by nontenured teachers, "would usurp and, if extended, destroy the authority of the school board." 244 Kan. at 469-70.

In *Butler* the court restated the *Coats* rule, recognized that *Butler* was a tenured teacher who was not certified to teach all of the nontenured teachers' subjects, and concluded:

"Thus, the balancing test enunciated in *Gillett* must be used, looking to the rights of the students and Board as well as the rights of the teacher. Under the facts of this case, the test weighs in favor of the students' rights. To arrange a schedule for Butler, the Board would have to overhaul the entire class schedule and would end up with three part-time teachers. In the

absence of bad faith, a board is not required to make such a drastic rear-rangement of its teaching assignments." 244 Kan. at 470.

Because Butler holds that a school board is not required to rearrange teaching loads by taking subjects away from several nontenured teachers in order to give a tenured teacher a full schedule, it is apparent that we must not require the Board in this case to force three tenured teachers to become part-time teachers in order to accommodate O'Hair.

Our Kansas Legislature did not provide in either the Contin-uing Contract Law, K.S.A. 72-5410 et seq., or the Due Process Procedure Act, K.S.A. 72-5436 et seq., that reduction in size of teaching staffs must be accomplished on a seniority basis. If this were required, the kind of "selective bumping" which O'Hair suggests would be necessary, but that is not the law of Kansas.

The factual situation herein is much more compelling for up-holding the decision of the Board than were the facts in Butler. We hold the balancing test enunciated in Gillett and applied in Butler requires a holding that the Board was not compelled to force three tenured teachers to become part-time teachers in order to allow a more senior tenured teacher (O'Hair) to enjoy employment and a full teaching load.

This decision follows the teachings of Butler. We are not ex-tending the holding of Butler but, rather, are applying its logic in a more restrictive manner, for here we are comparing the rights of a tenured teacher to those of other tenured teachers. Butler compared the rights of a tenured teacher to those of non-tenured teachers.

The only troubling issue in this comparison is that it appears in retrospect that McNeely, although thought by the administra-tion to be certified and qualified, was allowed to teach American history for the years 1986-87 and 1987-88 when he was not cer-tified. The evidence showed that an inquiry was made to the State Department of Education by the administration and it was believed that McNeely was certified. Anne Lousch who was cer-tified to teach American history, testified that McNeely was more qualified than she to teach the subject.

This problem is not that of Bauer v. U.S.D. No. 452, 244 Kan. 6, 765 P.2d 1129 (1988), which held that when a teacher is "certified" a rebuttable presumption exists that the teacher is

"qualified." If Anne Lousch had been assigned the American history class, it would have been taught by a tenured certified teacher. In balancing the rights of students, we are not prepared to strike down the decision of the Board in utilizing the teaching services of McNeely. This set of circumstances does not justify a finding of bad faith on the part of the Board.

In summary, we hold the Board's decision was supported by substantial competent evidence. The Board's policies were followed. Based upon the balancing test of *Gillett*, the teachings of *Butler*, and the facts of this case, the Board was not compelled to make three tenured teachers part-timers in order to retain O'Hair. The educational opportunities of the students were not compromised by allowing McNeely to teach American history. The Board did not act in bad faith.

*Did the Board's actions in considering the opinion*
*of the hearing committee violate the*
*due process rights of O'Hair?*

The trial court never reached the central issue of the application of *Butler* because the Board's actions were deemed to be "arbitrary, unreasonable and capricious conduct as well as being a denial of due process to the teacher" due to the following:

(1) The Board based its original determination and final decision on the superintendent's recommendation, which failed to inform the Board of the problems with McNeely's qualifications;

(2) the Board had made a decision to nonrew O'Hair's contract prior to the March 6, 1989, meeting as evidenced by the resolution which had already been prepared;

(3) the decision to nonrenew O'Hair's contract was made during executive session in violation of the open meetings law.

K.S.A. 72-5443 deals with the opinion of the hearing committee and states in applicable part:

"(c) If the members of the hearing committee are not unanimous in their opinion, the board shall consider the opinion, hear oral arguments or receive written briefs from the teacher and a representative of the board, and decide whether the contract of the teacher shall be renewed or terminated."

In *Haddock v. U.S.D. No. 462*, 233 Kan. 66, 77-78, 661 P.2d 368 (1983), the role of the Board was recognized as both an administrator and a quasi-judicial body. Justice Herd, speaking

for the court stated: "Regardless of the inherent difficulty in the conflict of these roles, the teacher's entitlement to a 'fair and impartial decision' [K.S.A. 72-5439(f)], requires that the Board strive for a high standard of detached objectivity when performing its role as a quasi-judicial body."

The role of an administrative body in performing a quasi-judicial function was considered in *Kelly v. Kansas City, Kansas Community College*, 231 Kan. 751, 648 P.2d 225 (1982). The non-renewal of two tenured teachers' contracts was upheld and due process was found to exist where not all of the board members had read the entire record. 231 Kan. at 759.

In the present case, the testimony of the Board president, Merlin Wedel, was that each member of the Board read the transcript of the record of the hearing committee and listened to the arguments from counsel for the teacher and the school district.

*Kelly* approved the school board being "made acquainted with the record through Board discussion, staff briefing and argument of counsel." 231 Kan. at 760. Because staff briefing was approved in *Kelly*, we cannot say that the superintendent's involvement here was a violation of due process. We believe that the better procedure might be to require the absence of the superintendent once such questions as the Board might have were answered, but we are not prepared to hold that his presence during the executive session where the hearing committee's opinion, the record, and the evidence were considered amounted to a due process violation requiring reversal of the Board's actions.

O'Hair and the Board both agree that the facts in this case differ from those in *Unruh v. U.S.D. No. 300*, 245 Kan. 35, 775 P.2d 171 (1989). O'Hair points out that in *Unruh* the board members did not read the transcript of the due process hearing, while here, the decision to nonrenew was made, as evidenced by the request for the superintendent to prepare a resolution, before the Board ever met to discuss the situation.

Justice Allegrucci in *Unruh* commented on the fact that an alternate resolution to renew had *not* been prepared, but the actions of the board were so otherwise deficient that this fact received no additional mention. 245 Kan. at 37.

This case differs from the facts in *Unruh* in many respects, although it involves the actions of the same board of education.

Here, unlike in *Unruh*, an executive session was held, oral argument was received, nobody testified to acting solely on the recommendation of the administrators, and everyone read the entire transcript of the testimony of the hearing committee before reaching a decision. The only similarity between the two cases is the preparation in advance of a resolution to approve later action, which we deem to be inadvisable. However, preparation of such resolution is not deemed fatal to O'Hair's due process rights.

The trial court's holding that the decision was made either prior to or in the executive session is incorrect. Board president Wedel's deposition clearly states that no decision was reached and that all of the evidence was discussed. His specific testimony from his deposition was as follows:

"Q. There was no vote taken in the executive session?

"A. Huh-uh.

"Q. No vote, no action taken?

"A. No, huh-uh.

"Q. Did the discussion—let me ask you this. There was no decision made whatsoever in the executive session. Is that correct?

"A. That is correct. None made in the executive session.

"Q. In the executive session, was there a consensus among the Board members?

"A. Yes.

"Q. As to what they would do?

"A. Yes."

When the executive session was concluded the Board, in open meeting, did vote that the contract of O'Hair be nonrenewed. The binding action was not taken in closed or executive session and the Kansas Open Meetings Act, K.S.A. 75-4317 *et seq.* was not violated.

The subject discussed in the executive session was "[p]ersonnel matters of non-elected personnel," which is specifically allowed under K.S.A. 75-4319(b)(1).

K.S.A. 75-4318 specifically provides: "[A]ny administrative body that is authorized by law to exercise quasi-judicial functions shall not be required to have open meetings when such body is deliberating matters relating to a decision involving such quasi-judicial functions."

In *Olathe Hospital Foundation, Inc. v. Extendicare*, Inc., 217 Kan. 546, 562, 539 P.2d 1 (1975), it was not deemed fatal that an appeals panel, after its all-day public hearing, retired for a 25-45 minute deliberative session with only the director of health planning and an assistant attorney general present. Apparently there had been a technical violation of the then new Open Meetings Act because a formal motion to retire to an executive session had not been made, but Justice Schroeder, writing for the court, stated: "Knowing violation of the act is a misdemeanor, but there is nothing to indicate that the action taken at a meeting which is in substantial compliance with the act should be void."

In this case, there was *not* a violation of the Open Meetings Act because, while the testimony indicated a consensus may have been reached by the parties as to how they intended to vote, the motion and the action thereon all took place in an open meeting.

We have considered all of the arguments of the parties whether specifically referred to or not. We have *not* considered the unpublished opinion cited in the Board's brief and consider offensive the remark therein to the effect that, while an unpublished opinion cannot be cited as authority, our rules do not prohibit counsel from "calling the Court's attention to its prior decision for whatever use of that prior decision the Court might desire to make."

The ruling of the trial court is reversed. The decision of the Board approving the nonrenewal of O'Hair's contract is reinstated.

Reversed.